**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TEXAS ELECTRIC COOPERATIVES, INC., TREATING DIVISION,**
**Respondent.**

**No. 24829.**

United States Court of Appeals
Fifth Circuit.

Aug. 2, 1968.

Marcel Mallet-Prevost, Asst. Gen. Cnsl., Richard Adelman, Atty., NLRB, Washington, D.C., for petitioner.

Morgan Hunter, Austin, Tex., Floyd W. Addington, Jasper, Tex., for respondent.

Before COLEMAN and GODBOLD, Circuit Judges, and RUBIN, District Judge.

COLEMAN, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order, in which it adopted the findings, conclusions and recommendations of its Trial Examiner. 160 NLRB No. 33.

The Trial Examiner found Texas Electric violated § 8(a) (1) and (3) by threatening employees with loss of benefits, engaging in surveillance of union activity, interrogating employees, promising benefits contingent on cessation of union activity, discriminatorily demoting employee Faulk, discriminatorily discharging employee Hennigan, and § 8(a) (5) by refusing in bad faith to bargain with the union[1] after being informed the union was authorized to represent the employees.

The Board ordered the company to post the customary notices, to read the notice, to reinstate Hennigan, to make Faulk whole for any loss of wages, and to recognize and bargain with the union.[2]

The company resists enforcement on the grounds that there is insubstantial evidence of the § 8(a) (1 )and (3) violations, that majority status of the un-

---

1. United Brotherhood of Carpenters and Joiners.

2. The portion of the order requiring recognition of the union involved setting aside the election, which the union lost 20–6, and ordering recognition and bargaining without another election. Bernel Foam Prods. Co., 146 NLRB 1277.

ion was not proved when the union initially sought recognition, and that the Board's order requiring the company to bargain and to read the notice is unwarranted by the evidence.

The Trial Examiner's findings of fact are extensive. Only background facts will be set out at this point, with findings as to particular violations stated in appropriate sections below.

The company operates a plant mainly concerned with treating poles with creosote for use by the electric cooperatives. Sometime prior to June 1, 1965, several employees signed a petition indicating interest in forming a union. Employee Hennigan then arranged to meet a union organizer (Shirley). On June 2, Hennigan began soliciting other employees to sign authorization cards, and within a week had obtained about seven executed cards. The Trial Examiner found that by the end of June Hennigan and an employee by the name of Marshall had obtained cards from a majority of the members of the unit. The Examiner further found that on July 16 the union made a sufficient demand for recognition, which was rejected by the company.

Board representation proceedings resulted in the direction of an election in a unit defined as "all production and maintenance employees * * * excluding * * * truck drivers * * * [and] guards. * * * " On October 8, 1965, the union lost the election.

The issues submitted to us are:

1. Whether substantial evidence on the record as a whole supports the Board's finding the company violated § 8(a) (1)?

2. Whether substantial evidence supports the Board's conclusion Hennigan was discharged and Faulk was demoted in violation of § 8(a) (3)?

3. Whether substantial evidence supports the Board's conclusion the company violated § 8(a) (5) by refusing to bargain with the union upon a showing that it was authorized to represent a majority of the employees in an appropriate unit?

4. Whether the order was proper?

*ISSUE #1*

*Section 8(a) (1) Violations*

The Board found the company violated § 8(a) (1) by engaging in coercive interrogations,[3] surveillance of union organizing activity,[4] by a pre-election

3. For example, Supervisor Baker told Employee Faulk he shouldn't have signed a union authorization card (J.A. 159–60), that he "messed himself up" by signing the card (J.A. 211–12), that he might get sent home from work early because of his union sympathy (J.A. 162, 367), and Baker suggested to Faulk's wife that she attempt to dissuade Faulk from his union activity (J.A. 167–69). Baker also asked Employee Dean if Dean knew anything about the union, whether he had signed a card, and who was "the root and branch" of the organizing effort (J.A. 208–09). Baker told Employee Hennigan he was "in trouble" for signing a union card (J.A. 74). Supervisor Lacey asked Employee Shaw whether he had attended a union meeting (J.A. 246–47), and, shortly before the election, how he planned to vote (J.A. 255). Supervisor Noel asked Employee Thomas if he had signed a union card, and about how many employees were at-

tending the union meetings. Noel warned the union might "mess [Thomas] up". (J.A. 212).

4. Two incidents are relied upon. On July 16 Baker, Lacey and Noel followed organizer Shirley in an automobile as Shirley was attempting to contact employees as they left the plant gate. (J.A. 34–36; 307–08). Shirley testified this activity made his campaigning more difficult. (J.A. 36).
On July 21, Supervisor Lacey and Anthony drove by an American Legion Hall while a union meeting was taking place. The Trial Examiner rejected their explanation they were picking up Lacey's child from a youth center which could be reached only by going by the meeting hall, and that they had no knowledge the meeting was in progress. The company seeks to overturn this credibility determination.

speech of Plant Manager Harper,[5] and by unilaterally changing the method of paying wages from bi-weekly to weekly after the election.

The company's response is directed not so much to the findings of § 8(a) (1) violations as they relate to the cease and desist order, but to undermining the § 8(a) (1) violations on a basis for the Board's order that it recognize and bargain with the union without another election. The Board's theory is clear: If it be assumed the union had a majority of the employees when it first demanded recognition in July, the coercive activities of the company leading up to the election in October served to dilute the union's support among the employees; and further, if the employees were coerced away from the union by the company's activity there is no indication another election would be any more representative of employee sentiments than the first. The company attacks this theory on two grounds: because a sizeable portion of its employees are illiterate, and there was no evidence the authorization cards were read to those who signed them, the Board failed to prove the union had an uncoerced majority of the employees when it demanded recognition; and its § 8(a) (1) violations were not of such a nature as to sway employees who signed authorization cards away from the union.

■ As we understand the tack taken by the company it recognizes there is substantial evidence to support the Board's findings or some § 8(a) (1) violations sufficient to form the basis of a cease and desist order, but it argues that these activities were not sufficient to support the order to bargain with the union. In our opinion the company's position reflects an accurate evaluation of the record with respect to the cease and desist order. Even if Harper's speech and the unilateral change in wage payment method are disregarded, there is substantial evidence to support the Board's conclusion the company violated § 8(a) (1) by employee interrogations and surveillance of union acitivity. Thus, the cease and desist portion of the order will be enforced.

## ISSUE #2

### The Discharge of Hennigan and Reassignment of Faulk

Employee Hennigan was a moving force in the organizing effort, and this was known to the company. On July 13 a company supervisor discussed this at some length with Hennigan, inviting him to redeem himself by informing on those who were responsible for the union activity. The next day, Hennigan was discharged without warning. Company testimony to the effect that Hennigan had been discharged for drinking on the job was totally discredited by the Trial Examiner.

Faulk was a union adherent, who remained steadfast in his allegiance. He had been warned by a supervisor that he should not have signed a union card. There were subsequent warnings from the supervisor. Then Faulk was demoted from one position to another and given a wage cut.

■ The explanation offered by company witnesses was found by the Trial Examiner to be "just incredible", that is, these employees had been discharged and demoted for union activity and not for the reasons assigned by the company. The record as to these employees met the test imposed by N.L.R.B. v. Brennan's, Inc., 5 Cir., 1966, 368 F.2d 1004, modifying 366 F.2d 560. See also, N.L.R.B. v. Robbins Tire & Rubber Co., Inc., 5 Cir., 1947, 161 F.2d 798; Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). On the record as a whole the § 8(a) (3) orders as to these employees must be enforced.

5. Harper's speech, delivered the day before the election, is set out in the record at J.A. 412–30. The portion found particularly offensive by the Board is reprinted at pp. 15–16 of the Board's Brief.

## ISSUE #3

### Refusal to Bargain, § 8(a) (5)

The validity or invalidity of authorization cards is at the heart of this issue. The company does not dispute that the union was in possession of authorization cards signed by a majority of its employees. It contends, however, that its refusal to bargain at the time of the union demand for recognition was based on a good faith doubt as to its majority status because a large percentage of the employees were illiterate and there was no evidence the cards had been read to them.

The Trial Examiner found the company, in bad faith, had refused recognition in order to gain time to undercut the union majority prior to an election. As evidence of bad faith the Board relies principally on (1) numerous § 8(a) (1) violations after the union's demand and on (2) the company's failure to submit to a third party check of the union majority.

From several employees who testified at the unfair labor pactice hearing the company elicited statements that they could not read and that the cards had not been read to them at the time they were signed. The Trial Examiner considered it irrelevant that the employees could not read because the language on the cards was clear. The Trial Examiner and the Board thus employed an erroneous standard to determine whether the union had a valid majority when recognition was demanded.

Extensive discussion is unnecessary because this entire field was thoroughly surveyed and mapped in a recent decision of this Court, N.L.R.B. v. Southland Paint Co., 5 Cir., 394 F.2d 717 [Before Judges Brown, Wisdom, and Thornberry, May 8, 1968]. The opinion in *Southland* teaches that when the company introduces evidence to indicate that employees did not understand what they were signing (when their names are affixed to authorization cards) the Board must establish "by a preponderance of the evidence that the signer of the card did, in effect, do what he would have done by voting for the union in a Board election". The record is incomplete as to the identity or actual numbers of the illiterates or the number of those who, despite their inability to read, nevertheless understood the authorization and directed that their names be affixed thereto. By applying an erroneous standard to the facts the Trial Examiner precluded a probe into the subjective intent of the challenged signers. See Engineers & Fabricators v. N.L.R.B., 376 F.2d 482, 487 (5th Cir., 1967). This error also led him to cut the company off from presenting a complete picture of the degree of illiteracy among its employees. The General Counsel made no attempt to present evidence that the challenged signers understood what they were signing. There is thus no substantial support in the record for a finding that a majority of the employees knowingly and understandingly authorized union representation. This necessitates the further conclusion that the record fails to support a finding that the company acted in bad faith in doubting the validity of the purported majority authorization at the time the demand was made.

We, therefore, deny enforcement with respect to the § 8(a) (5) charges, including the Board's order that the company recognize and bargain with the union.

## ISSUE #4

The company objects to the requirement that the cease and desist portions of the order be read to the employees. Obviously, if the employees are illiterate and thus not able to read the posted notice it is not unreasonable to require the company to have the notice read.

As to the § 8(a) (1) and § 8(a) (3) violations the order of the Board must be enforced.

As to the § 8(a) (5) charge, enforcement will be denied.

Enforcement granted in part and in part denied.