**MARINE WELDING AND REPAIR WORKS, INC., Williamson Engine and Supply, Inc., Greenville Manufacturing and Machine Works, Inc., and Greenville Propellor Works, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 20042.**

United States Court of Appeals, Eighth Circuit.

March 1, 1971.

Alan I. Berger, Gerald Tockman, McMahon & Berger, St. Louis, Mo., for petitioner.

Eli Nash, Jr., Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Attys., N. L. R. B., for respondent.

Before GIBSON and BRIGHT, Circuit Judges, and McMANUS, Chief District Judge.

PER CURIAM.

The National Labor Relations Board determined that Marine Welding and Repair Works, Inc., Williamson Engine and Supply, Inc., Greenville Manufacturing and Marine Works, Inc. and Greenville Propellor Works, Inc. (collectively petitioner or company), as a single employer under the Act, had committed multiple and extensive violations of §§ 8(a) (1) and 8(a) (3) of the National Labor Relations Act. 174 N.L.R.B. No.

102. These companies petition to set aside the Board's order and the Board cross-applies for enforcement, pursuant to 29 U.S.C.A. §§ 160(e) and (f). These proceedings were consolidated with hearings on a petition to set aside the results of a representation election. We grant enforcement of the Board's order, as issued to remedy petitioner's unfair labor practices, with one modification.

Marine Welding was formed in 1947 and was then owned principally by W. M. and Bilbo Williamson, who are brothers. Generally, the company builds and repairs boats and barges. In 1959, Joe Williams, a company employee for seven years, bought stock in Marine Welding and became one of the owners. They then formed Williamson Engine to assume Marine Welding's engine rebuilding and marine parts and supplies sales business. That year, also, they purchased a going machinery works, Greenville Manufacturing. In 1964, they formed Greenville Propellor as an adjunct to their existing businesses. This company undertook the function of boat propellor sales and repair. W. M. Williamson serves as president, Joe Williams as vice president and Bilbo Williamson as secretary-treasurer of each of the four corporations.

The union[1] campaign started at the end of April, 1967. By May 1, the union filed and served a petition for a Board election. The election was held July 18, 1967, and the union lost by a vote of 64 to 24. Shortly thereafter, the union filed unfair labor practice charges. Those charges, as well as others added subsequently, focus on the company's conduct, both before and after the election. The Board sustained the bulk of the unfair labor practice charges.

The company here contends that: (1) the board erred in determining that the several companies constituted a "single employer" under the Act; (2) the findings of unfair labor practice charges are unsupported in the record; (3) the Board's order, especially insofar as it sets aside the July 18 election and calls for a second election, constituted "prohibited punishment"; and (4) the Trial Examiner in the course of the hearings, and the Board in its decision, "denied petitioner every element of due process." We consider each contention.

I.

■ We initially test petitioner's claim that it should not be treated as a single employer. To determine whether a group of businesses are to be considered as a single unit and not separately by each segment, we examine the following manifestations of organizational unity: (1) Interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S. Ct. 876, 13 L.Ed.2d 789 (1965); see N. L.R.B. v. Aircraft Engineering Corp., 419 F.2d 1303 (8th Cir. 1970). A review of the record as a whole satisfies us that each of these criteria has been proven here by substantial evidence.

■ The operations of each of the four companies are functionally interrelated. Whatever work is to be done may be done by any appropriate employee wherever he normally works or wherever the work is to be done. Some employees of one company worked side by side with employees of the other firms. Temporary employee exchanges between companies have occurred in the past. The firms occupy some office space and facilities in a single waterfront building. The Williamson brothers and Joe Williams decide labor relations matters and problems of management. Apparently, despite whatever boundaries exist between the corporations, these three men in financial control oversee all opera-

---

1. Industrial, Technical and Professional Employees Division of National Maritime Union of America, AFL-CIO.

tions. This situation as detailed in the record of the case portrays one employer within the purview of 29 U.S.C.A. § 152(2) for purposes of proceedings under the Act.

## II.

■ The Board found numerous violations of § 8(a) (1) of the Act. It serves no useful purpose to describe in detail the broad range of conduct on petitioner's behalf which interfered with the employees' right to organize. The Trial Examiner adequately documented his findings. Company officials coercively interrogated employees concerning union activity without giving any assurance that the company would not act against those assisting or cooperating with the union. Executives and supervisors requested or demanded that employees revoke their pledges to the union. Some employees evidencing union support were subjected to threats of economic harm; others were threatened with the likelihood of more onerous working conditions should the union succeed. Through statements and comments of supervisory personnel, the company created an appearance of surveillance of union activity. One company supervisor went so far as to attempt to arrange a frame-up of one of the mechanics actively supporting the union. The supervisor suggested that an engineer on the yacht Everlasting, then undergoing repair by the petitioner, furnish intoxicants to the mechanic in question and thus afford the employer an excuse to fire him for drinking on the job. The engineer, however, refused to cooperate but reported the incident to the employee.

The Board found the employer flagrantly violated the rights of the employees to freely vote in a representation election. Armed guards patrolled the polling area for the apparent purpose of intimidating petitioner's employees. One employee, previously discharged, but entitled to vote, was detained in a company building with armed guards patrolling nearby for approximately one hour before being permitted to cast his ballot. On the day of the election, other employees were sent to work assignments out on the river and then unnecessarily detained there until the polls had closed.

■ Also, the Board found as separate §§ 8(a) (1) and (3) violations that petitioner reduced overtime work on Saturdays during the summer of 1967 for the purpose of discriminating against mechanics Blaylock, Harrison and Long, who supported the union. While the superintendent's prediction that overtime work would be lost due to "this union mess" provided a basis for a § 8(a) (1) violation of the Act, this statement alone does not provide substantial evidence on which to find or from which to infer that the company reduced overtime for these mechanics because of their loyalty to the union. From our review of the payroll records, which reflect daily hours worked, we noted that no mechanic, whether shown as a union adherent or not, worked any substantial amount of overtime during the period in question. The record is bare of any other affirmative evidence showing discrimination in employment in support of this charge. Accordingly, we reject the Board's finding on this § 8(a) (3) violation and also reject paragraph 2(b) of the order entered by the Board which granted those employees reimbursement for loss of Saturday overtime during the pay periods of May 31 to September 6, 1967.

The Board also found that the company violated § 8(a) (3) by its discharge of three employees. The company offered reasons for each discharge, but the Board, upon whose discretion we must place substantial reliance on matters of fact, felt that the reasons given were pretextual and that the discharges were actuated by an intent to discourage union membership. Substantial evidence on the record as a whole supports these findings, and thus they are conclusive.

In sum, on this record, we observe conduct by an employer which violated the Act to a degree where we can say with certainty that the employees' rights

to engage in concerted organizational activity were interfered with and restrained to a point of almost total obliteration.

### III.

Petitioner further contends that the remedies contained in the Board's order, including setting aside the representation election, punishes, humiliates and degrades petitioner. Generally, the order is a typical one requiring the company to cease and desist from interfering or restraining the employees in the exercise of their Section 7 rights, requiring an offer of reinstatement and restitution of losses to the discharged employees and requiring the employees be given adequate notice of their rights, in this case by requiring that a responsible officer, supervisor or representative of the Board read an appropriate notice to the employees. These aspects of the order fall well within the Board's discretion. 29 U.S.C.A. § 160(c). A requirement that employees be 'read their rights is proper where, as here, some employees lack necessary reading skills to comprehend a posted notice. N.L.R.B. v. Texas Electric Cooperatives, Inc., Treating Div., 398 F.2d 722, 726 (5th Cir. 1968). Moreover, the Board's action in ordering a new election is not ripe for review in the present proceedings. Orchard Corporation of America v. N.L.R.B., 408 F.2d 341, 342 n. 1 (8th Cir. 1969); Morse Instrument Co. v. N.L.R.B., 388 F.2d 1, 2 n. 1 (6th Cir. 1967); N.L.R.B. v. William J. Burns International Detective Agency, 346 F.2d 897, 899 (8th Cir. 1965).

### IV.

Finally, petitioner complains that:

From the opening of the record in the consolidated proceeding through its close, the Board's Trial Examiner, by *denial of cross examination* and *interjection of vituperation,* refused to "hear" anything which did not fit into a *biased and calculated prejudgment of this entire case of such magnitude, denial of due process cannot be questioned.* The Trial Examiner's *predetermination to "convict,"* reflected in a *biased and prejudiced hearing proceeding,* was distilled into a 49 page Intermediate Report * * * containing *far-reaching and excessive penalties* issued more than 1 year after close of the record. With minor and irrelevant exceptions, the Board adopted and approved the Decision and Order of its Trial Examiner on February 20, 1969 * * *. (Emphasis in the original.)

The Board, on this issue, stated:

On the contrary, the record shows that the Trial Examiner displayed fairness to, and patience with, the Respondent's counsel throughout the hearing even though some demands which were made upon the Trial Examiner, and of witnesses, appear to have been frivolous, or dilatory, or both.

We wholeheartedly agree with the Board's conclusion. See N.L.R.B. v. International Brotherhood of Electrical Workers, 432 F.2d 965, 968–969 (8th Cir. 1970).

Petitioner's counsel, not only in cross-examination, but in his presentation, often went beyond the role of the conscientious advocate to the point of nearly obstructing the proceedings. "The right to cross-examine does not extend to the right to cross-examine endlessly. * * *." Food Store Employees Union Local 347, Amalgamated Meat Cutters and Butcher Workmen of North America, A.F.L.–C.I.O. v. N.L.R.B., 137 U.S.App.D.C. 248, 422 F.2d 685, 692 (1969). The Trial Examiner sustained repeated objections to certain forms and areas of examination, but petitioner's counsel constantly ignored these rulings.

The company counsel displayed intransigence towards the Trial Examiner's request that the relevant company payroll records should be produced, despite the fact that the counsel had earlier indicated that he would produce the informa-

tion. As the Trial Examiner continued to press for these records, the counsel—almost unbelievably—asked on a number of separate occasions which records the Trial Examiner wanted. At another point, counsel attempted to learn the names of employees who were contacted by the union adherent who was testifying. The Trial Examiner promptly sustained an objection to the "little 8(a) (1) interrogation." Yet, time and time again, petitioner's counsel attempted to circumvent this ruling by asking the same or similar questions of other witnesses. When objections to these efforts were sustained, petitioner's counsel continued redundant and overly-long arguments on the rulings. These are but two examples of a veritable plethora of petty and repetitious objections made by petitioner's counsel followed by expansive arguments in resisting and seeking to overcome the Trial Examiner's rulings. This conduct hampered and delayed the course of the proceedings before the Trial Examiner.

█ While we recognize the contentions and heated context in which these hearings were held, we can in no way condone the conduct of petitioner's attorney which transformed the hearing from a proceeding seeking ascertainment of the truth into a wrangling battle of nerve and personality. We countenance and encourage helpful objection, but we deplore the delaying efforts of pointless obstruction as represented by lengthy, repetitious arguments relating to trivial or already finally determined matters.

█ Our review of this record satisfies us that the Trial Examiner acted without any demonstrated bias, and he, in the face of very aggravating conduct by petitioner's counsel, allowed and encouraged a full and fair hearing on all relevant matters.

Accordingly, we grant enforcement of the Board's order as modified. We award respondent Board its costs.