[Civ. No. 3670. Fifth Dist. Dec. 23, 1980.]

JASMINE VINEYARDS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

COUNSEL

Seyfarth, Shaw, Fairweather & Geraldson and George Preonas for Petitioner.

Harry J. Delizonna, Dennis M. Sullivan, Marvin J. Brenner, Ellen Lake, Manuel M. Medeiros, Gary Williams, Elise Manders and Suzanne Vaupel for Respondent.

Jerome Cohen, Sanford N. Nathan, Tom Dalzell, Deborah W. Peyton, W. Daniel Boone, Glenn Rothner, E. Michael Heumann II, Linton Joaquin, Ellen Greenstone, George C. Lazar, Dianna Lyons, James Rutkowski, Kirsten L. Zerger, Marco E. Lopez, Carlos M. Alcalos, Francis E. Fernandez and Carmen C. Flores for Real Party in Interest.

OPINION

FRANSON, J.—

STATEMENT OF THE CASE

Petitioner, Jasmine Vineyards, Inc. (Jasmine), an agricultural employer, seeks review of a final order of the Agricultural Labor Relations Board (Board) finding Jasmine guilty of unfair labor practices and ordering certain remedies.

The Board found that during an organizing campaign preceding an anticipated representational election Jasmine had (1) discriminated against the United Farm Workers (UFW) and in favor of the Teamsters Union in enforcing a no-solicitation policy; (2) solicited employees to sign Teamster authorization cards; and (3) made threats against em-

ployees if they should join the UFW or if the UFW should win the impending election.

The Board ordered Jasmine to cease and desist from engaging in the unfair labor practices and to take certain affirmative action, including allowing UFW organizers to take access during the next organization campaign in which the UFW filed a notice of intent to take access without restriction as to the number of organizers, and to post, mail and read to employees, in appropriate languages, a specified notice advising employees of the outcome of the case and of their rights under the Agricultural Labor Relations Act (ALRA).

On April 7, 1980, following a remand order of this court, the Board modified certain portions of its cease and desist order and affirmative remedies which will be discussed later in this opinion.

FACTS

The events which gave rise to the charges all occurred in August and September 1975. The effective date of the ALRA was August 28, 1975.

Jasmine had a pre-ALRA collective bargaining agreement with the Teamsters Union covering rank and file employees. The contract allowed Teamster representatives to visit Jasmine premises for union purposes at all reasonable times. On July 28, 1975, the Teamsters notified Jasmine by letter that Teamster agents would be visiting Jasmine properties on a daily basis until expiration of the contract. Jasmine replied in a letter dated August 20, 1975, that access would be permitted for conducting legitimate union business provided that advance notification of the visits was given and approval was obtained and provided that the visits were at reasonable times and places and did not interfere with or disrupt operations or harass or disturb Jasmine employees. The UFW at about the same time requested Jasmine to grant its organizers access to Jasmine properties before and after work hours and during break periods. Jasmine in a letter dated August 20, 1975, to the UFW denied this request, stating also that no other union would be granted access for organizing purposes.

Agents of both unions repeatedly entered Jasmine premises for organizing purposes notwithstanding the letters. The UFW organizers were treated as trespassers by Jasmine officers and supervisory employees. During this same period, Teamster agents apparently had free access

for organizing purposes during work periods as well as during break periods.

A representation election by Jasmine employees was to be held under Board auspices on September 17, 1975.[1] At a date not established with certainty, in either August or September 1975, Vincent Zaninovich, president of Jasmine, and Martin Zaninovich, a Jasmine executive, addressed a meeting of employees at a box shed on Jasmine premises and made some remarks about what might happen if the UFW should win the election. The Board found, Chairman Brown dissenting, that the meeting occurred after the ALRA went into effect, and ruled that Martin's remarks by their nature were protected under Labor Code section 1155 as a free expression of opinion, but that Vincent's remarks were threatening in nature and not protected.

Two employees testified about separate conversations they had with Vincent Zaninovich shortly before the election in which he made remarks concerning the election. One employee, Santana Piniero, testified that Zaninovich told him, "Tomorrow is the day of the elections. . . . No matter how long you work for me, any of your family that double-crosses me, it matters not. You will leave from work." In the context, this was understood as meaning that Piniero would be fired if he or any of his family voted for the UFW. Another employee, Maria Aleman, testified that Vincent Zaninovich told her he was afraid that if the UFW won he would have to pull up the vines. The Board found that in both instances Vincent Zaninovich made unlawful threats in violation of section 1153, subdivision (a).

Santana Piniero also testified that on at least two occasions in September 1975, prior to the election, Vincent Zaninovich asked him to sign a Teamsters authorization card. Zaninovich admitted that he made one such request to Piniero before September 10. He could not recall whether he made more than one such request.

#### SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING OF UNFAIR LABOR PRACTICES

Jasmine's brief raises issues as to the nature of the review by the Court of Appeal, the constitutionality of the ALRA, and the standard

---

[1]The Teamsters received a majority of the votes cast at the election; however, on December 26, 1976, the Teamsters withdrew its petition for certification as the bargaining agent for Jasmine's employees and on January 3, 1977, the regional director declared the election null and void.

to be applied in reviewing the evidence. These questions have been answered in *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579] and will not be discussed further.

■ Jasmine seems to argue that this court must make an independent determination of the facts from the entire record, unfettered by the Board's findings. Petitioner misconceives the substantial evidence rule.

Labor Code section 1160.8 provides that the Board's findings of fact "shall be conclusive" on review "if supported by substantial evidence on the record considered as a whole." (See also *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd., supra,* 24 Cal.3d 335, 342-346.) This means the court must examine the entire record, including evidence which detracts from the Board's decision. (*Universal Camera Corp. v. Labor Bd.* (1951) 340 U.S. 474, 487-488 [95 L.Ed. 456, 467-468, 71 S.Ct. 456]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143-144, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242]; *Le Vesque v. Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432]; Cal. Administrative Mandamus (Cont.Ed.Bar Supp. 1977) § 5.75, pp. 66-67.) On a parallel question under the National Labor Relations Act, the high court said in *Universal Camera Corp.:* "To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.* Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." (*Universal Camera Corp. v. Labor Bd., supra,* 340 U.S. at p. 488 [95 L.Ed. at pp. 467-468].) (See also *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 258, 264-268 [168 Cal.Rptr. 537].)

■ Credibility of witnesses is particularly for the Board's determination and is not reviewable by the court unless the testimony is incredible on its face or inherently improbable. (*Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 463-464 [150 Cal.Rptr. 495]; *N.L.R.B.* v. *Internat'l Union of Operating Engineers* (6th Cir. 1974) 500 F.2d 48, 49.)

■ There is ample testimony on the record from which the Board could find that after the ALRA became effective Jasmine discriminated against the UFW and in favor of the Teamsters in enforcing or attempting to enforce its announced no-solicitation policy.

Jasmine argues that the UFW organizers were trespassers while the Teamsters' agents were not necessarily trespassers, in view of the contract Jasmine had with the Teamsters which permitted them to conduct legitimate union business with Jasmine's employees. From this Jasmine contends that it could not as a practical matter determine whether the Teamster agents were engaged in organizing activities or other union business. Nevertheless, there was testimony that Teamster agents were openly passing out organizing leaflets etc. without challenge by Jasmine's management personnel, while the same personnel were actively trying to prevent UFW organizers from talking with employees on petitioner's premises.

NLRB precedent clearly establishes that it is an unfair labor practice for an employer to discriminate in favor of one union against another union in allowing access to employees on the employer's premises. (*Labor Board* v. *Waterman S.S. Corp.* (1940) 309 U.S. 206, 224-226 [84 L.Ed. 704, 714-716, 60 S.Ct. 493]; *I. A. of M.* v. *Labor Board* (1940) 311 U.S. 72, 78-80 [85 L.Ed. 50, 55-56, 61 S.Ct. 83].)

■ The primary issue concerning the antiunion threats Vincent Zaninovich allegedly made to employees on several occasions is as to when the threats were made—i.e., whether before or after the ALRA went into effect. The box shed incident was particularly open to doubt as to when it occurred. Chairman Brown dissented from his two colleagues, who adopted the administrative law officer's finding that the incident occurred in September 1975, after the act became effective. The evidence at this point was conflicting and while this court might have reached a different conclusion, nevertheless, there was direct testimony placing the incident in September, and also circumstantial

evidence that seemed to corroborate this testimony. Reasonable inferences can therefore be drawn from the evidence to support the finding that the box shed incident occurred after the effective date of the ALRA.

Each of the other threat incidents which the Board found to have occurred after the ALRA went into effect was established by testimony of the employee to whom the threat was made. Jasmine's argument is basically an attack on the credibility of the general counsel's witnesses; in each instance, however, the testimony measures up to the substantial evidence standard.

■ The Board also found that Jasmine "through Vincent Zaninovich, urged and solicited its employees to sign Teamster authorization cards on more than one occasion." Jasmine does not challenge the sufficiency of the evidence to support this finding, but argues that the evidence merely showed a solicitation of one employee and that the incident was isolated and "de minimis" and should not be treated as an unfair labor practice. Vincent Zaninovich admitted in his testimony that he did ask Santana Piñiero to sign a Teamster authorization card on one occasion and could not remember whether he did so more than once. Such an admission by Jasmine's president reasonably implies a violation of the ALRA (Lab. Code, §§ 1152, 1153). The Board was perfectly justified in inferring from all of the evidence that the solicitation under the particular circumstances was neither isolated nor de minimis.

## THE REMEDIES ORDERED BY THE BOARD IN ITS SUPPLEMENTARY DECISION AND REVISED ORDER ON REMAND ARE AUTHORIZED BY THE ALRA AND SHOULD BE ENFORCED

By order dated December 7, 1979, this court, without deciding the substantive issues, remanded the cause to the Board for further proceedings. We asked the Board to reconsider the nature and extent of the expanded access remedy which it had ordered in light of the "current and changed circumstances";[2] to reconsider the provisions of

[2] "Current and changed circumstances" might well include, e.g., the fact that the Teamsters Union is no longer competing with the UFW; and the fact that the ALRA itself and the access rule and other pertinent regulations of the Board are now well established, the legal uncertainties about them which once existed having been largely resolved, and are much better and more widely understood by agricultural employers and workers than was true five years ago when the unfair labor practices here occurred or even three years ago when the Board made its original order; and might also include

paragraph 2(d) of the ordered remedies referring to "anachronistic dates" (mailing of copies of attached notice to all employees employed between Aug. 28 through Sept. 17, 1975); to reconsider the provisions of paragraphs 2(c) and (e) of the ordered remedies (posting and reading a notice in appropriate languages to assembled employees on company time and providing time for employee questions and answers by Board representative concerning employee rights) in light of the changed membership in the work force since the date of the unfair labor practices; and reconsidering and modifying the breadth of the cease and desist order contained in paragraph 1(d) of the ordered remedies in the light of *Labor Board* v. *Express Pub. Co.* (1941) 312 U.S. 426 [85 L.Ed. 930, 61 S.Ct. 693] and *Morrison-Knudsen, Inc.* v. *N. L. R. B.* (9th Cir. 1959) 270 F.2d 864. We directed the Board to take whatever additional evidence it deemed appropriate on the questions and to make new findings and a proposed order.

■ On April 7, 1980, the Board filed with this court a supplementary decision and revised order in which it stated it had reviewed and reconsidered the portions of the original remedial order as specified in this court's remand order and made the following findings and modifications to its original remedial order:

1. It found that expanded access is still an appropriate remedy for an employer's unlawful interference with communication between employees and union organizers (see *Nagata Brothers Farms* (1979) 5 A.L.R.B. No. 39). It is possible that current employees who were not working at the time of the unfair labor practices nonetheless may be aware of the illegal acts of the employer. It is important that the UFW be given expanded access to restore, insofar as possible, the conditions that would have existed absent the unfair labor practice. Giving the UFW expanded access to current employees enables the employees to have access to information to assist them to organize into representative units pursuant to the specific governmental policy of encouraging collective bargaining. (See *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 402 [128 Cal.Rptr. 183, 546 P.2d 687].) Since the particular means by which the effects of unfair labor practices are to be expunged are for the Board and not the courts, we must respect the access remedy here imposed. (Cf. *Virginia Electric Co.* v. *Board* (1943) 319 U.S. 533 at p. 539 [87 L.Ed. 1568 at pp. 1573-1574, 63 S.Ct. 1214].)

any relevant change of circumstances of the employer, in this case Jasmine, that would make a particular remedy no longer appropriate or needed.

The Board, however, agreed that it was neither necessary nor warranted to allow the UFW unrestricted access in order to remedy petitioner's violations. It therefore modified its original order to permit the UFW to take access to petitioner's premises pursuant to the provisions of California Administrative Code, title 8, section 20900 by *2* organizers for every 15 employees in each work crew on the property during the 12 months following the issuance of the Board order.[3]

■ 2. After due consideration on remand, the Board again concluded that mailing the prescribed notice to employees who were employed between August 28, 1975, and September 17, 1975, is an appropriate means to dispel the effects of respondent's illegal conduct.

The Board reasoned that the mailing remedy, like the posting and reading remedies, informs employees of the outcome of the unfair labor practice proceeding and of their organizational rights guaranteed by the ALRA. Employees employed at the time of the unfair labor practice are interested in the proceeding and should be notified of the outcome. The NLRB has ordered such a notice to be mailed to former employees as an appropriate means of informing all interested and affected employees of the results of the NLRB proceeding. (*Lipsey, Inc.* (1968) 172 N.L.R.B. 1535 [68 L.R.R.M. 1568].) The Board explained that such notification also serves the purposes of the act because it dispels any lingering effects of the employer's unfair labor practices which would tend to inhibit employees in the future exercise of their statutory rights with this employer or other employers. The knowledge that their rights are being protected by the Board may influence and encourage the future exercise of those rights. (See Lab. Code, § 1140.2 which states it to be the policy of the State of California to "encourage and protect" the right of agricultural employees to full freedom of association and self-organization. (See also *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392, 398.)[4]

---

[3]This is reasonable in light of the regulation which authorizes "two organizers for each work crew—provided that if there are more than 30 workers in a crew, there may be one additional organizer for every 15 additional workers."

[4]The prescribed notice states as follows:

"NOTICE TO EMPLOYEES

"After a trial where each side had a chance to present their facts, the Agricultural Labor Relations Board has found that we interfered with the right of our workers to freely decide if they want a union. The Board has told us to send out and post this Notice. [¶] We will do what the Board has ordered, and also tell you that: [¶] The Agricultural Labor Relations Act is a law that gives all farm workers these rights: [¶]

■   3. In its supplemental decision, the Board reconsidered the posting, reading and educational requirements concerning the prescribed notice and employee rights under the ALRA. It found that notwithstanding employee turnover, the posting, reading and educational requirements are appropriate remedial measures for petitioner's unfair labor practices, citing *M. Caratan, Inc.* (1980) 6 A.L.R.B. No. 14.

In *M. Caratan, Inc., supra*, the Board explained its reasons for requiring a reading of a remedial notice to current employees followed by a question and answer period on paid company time and why such a procedure may not be accomplished by some alternative method such as reading the notice immediately before or after regular working hours or during the luncheon break at the sites where individual crews are working. Said the Board: "The high degree of illiteracy or semi-literacy among agricultural employees and the physical setting in agriculture make it difficult to communicate adequately with employees by merely posting a Notice. A reading of the Notice followed by a question-and-answer period serves the important functions of informing workers of the outcome of the unfair labor practice proceedings and of answering their questions about the Notice and the rights guaranteed to them by the Act. . . .

"Reading the Notice to employees on paid company time, rather than on nonwork time, is necessary to ensure the widest possible dissemination of the Order and full participation in the reading session by the workers. We find that the effectiveness of the reading remedy would be significantly and impermissibly reduced if the readings were not held on company time. Unlike the industrial setting, the agricultural setting makes communication with employees during nonwork time difficult.

---

1. To organize themselves; [¶] 2. To form, join or help unions; [¶] 3. To bargain as a group and choose whom they want to speak for them; [¶] 4. To act together with other workers to try to get a contract or to help or protect one another; and [¶] 5. To decide not to do any of these things. [¶] Especially: [¶] WE WILL NOT threaten employees with loss of employment in order to discourage union activity. [¶] WE WILL NOT prevent union organizers from coming onto our land to tell you about the union when the law allows it. [¶] WE WILL NOT change your working conditions or shorten your lunch hour because of the union.

"Dated:                                   JASMINE VINEYARDS, INC.

"By:_____
                      Representative                    Title

"This is an official Notice of the Agricultural Labor Relations Board, an agency of the State of California.

"DO NOT REMOVE OR MUTILATE

Agricultural workers generally do not assemble at a common place and time before or after the work day. Workers usually do not arrive at the fields until it is time to start work. They often travel by private car or by bus from pickup points to their respective work sites shortly before work commences. Unlike many industrial workers, agricultural employees do not pass through a gate or gather at a fixed area when they arrive at or leave work. Often they work in scattered groups over many acres of fields. In addition, agricultural employees generally do not stop and start work all at the same time; the time when work begins and ends for the various crews depends upon a number of factors, including weather, crop and market conditions, and the pace of the work.

"Assembling and communicating with the employees during their lunch times is also difficult. Farm workers do not customarily eat lunch at a common gathering place. Instead, they eat their lunches in their cars or in buses at the edge of the field or, in some instances, in the fields at their respective places of work. Furthermore, lunch breaks are often taken at staggered intervals rather than at a prescribed time, particularly when the employees are paid on a piece-rate basis. This situation compounds the difficulties of assembling and speaking with the employees. See *Agricultural Labor Relations Board* v. *Superior Court*, 16 Cal.3d 392, . . .

"In addition to problems in communication inherent in the agricultural setting, there are other factors which reduce the effectiveness of reading the Notice on nonwork time. Reading before or after working hours does not take into account outside pressures, such as family responsibilities or transportation arrangements, which prevent workers, who would otherwise wish to listen, from attending the session. Reading during the lunch break unfairly penalizes employees who thereby lose part of this break and, especially for those paid on a piece-rate basis, lose earnings.

"The fact that reading the Notice may involve certain monetary costs to Respondent does not render the remedy inappropriate. Where the NLRB has found that a respondent has committed unfair labor practices and the burden of a remedy must necessarily be placed either upon the wrongdoing respondent or upon the wronged employees, the Supreme Court has held that the wrongdoer must bear the burden. See *NLRB* v. *J. H. Rutter-Rex Mfg. Co.*, 396 U.S. 258 . . . (1969). Requiring employees to use their nonwork time to receive information about the results of an unfair labor practice proceeding and about their relat-

ed statutory rights places an unwarranted burden on the employees. . . . The reading, like other remedial provisions of the Order, serves to remove, insofar as possible, the consequences of Respondent's violations of the Act. Therefore, it is appropriate that Respondent bear the incidental costs of the remedy as part of its obligation to restore the status quo." (*M. Caratan, Inc., supra*, 6 A.L.R.B. No. 14, pp. 1-4.)

Although we might not agree wholeheartedly with the foregoing reasoning of the Board, we nonetheless conclude that it is grounded on policy considerations which are properly addressed to the Board and to the Legislature and not to the courts.

The Board has broad discretion in fashioning remedies which will effectuate the purposes of the act (Lab. Code, § 1160.3). One of the stated purposes of the act is to "encourage and protect" the right of agricultural employees to be free from interference, restraint or coercion of employers in the exercise of their self-organizational rights (Lab. Code, § 1140.2).[5]

■ The Board in its presumed expertise must be given relatively free reign in determining which remedy will best effectuate the policies of the act. It is only when the remedies ordered by the Board are patently outside the Board's authority that a reviewing court can interfere. (See *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 216 [13 L.Ed. 2d 233, 241-242, 85 S.Ct. 398, 6 A.L.R.3d 1130]; *Republic Aviation Corp.* v. *Board* (1945) 324 U.S. 793, 798 [89 L.Ed. 1372, 1376-1377, 65 S.Ct. 982, 157 A.L.R. 1081].) As the Supreme Court stated in *Phelps Dodge Corp.* v. *Labor Board* (1941) 313. U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845, 133 A.L.R. 1217]: "Because the relation of remedy to policy is peculiarly a matter of administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of poli-

---

[5]Labor Code section 1140.2 reads as follows: "It is hereby stated to be the policy of the State of California *to encourage and protect* the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing, to negotiate the terms and conditions of their employment, and to be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. For this purpose this [act] is adopted to provide for collective-bargaining rights for agricultural employees." (Italics added.)

cy." (See also *Fibreboard Corp.* v. *Labor Board, supra*, 379 U.S. 203, 216 [13 L.Ed.2d 233, 241-242].)

Jasmine argues that the reading of the notice by a Board representative followed by a question and answer period on company time is economically burdensome, unfair and punitive in nature. However, the actual reading of the notice will take but a few minutes and we should presume that the Board representatives will be impartial in their explanation of employee rights and will not utilize any more company time than is reasonably necessary to answer employee questions. We should not question the integrity of the administrative agency or its representatives in effectuating the policies of the act—other forums exist for this purpose.

Finally, we observe that the Board on remand reconsidered its broad cease and desist order in the light of *Labor Board* v. *Express Pub. Co., supra*, 312 U.S. 426, again referring to its decision in *M. Caratan, Inc., supra*, wherein it announced its intention to follow the NLRB standard to the end that such orders will be issued only when "a respondent demonstrates a proclivity to violate the act or engages in such widespread and egregious misconduct as to demonstrate a general disregard for employees' fundamental statutory rights." Finding that petitioner's conduct in the present case does not justify a broad cease and desist order, the Board modified and narrowed its order to prohibit petitioner from "interfering with, restraining, or coercing employees in the exercise of their organizational rights in any manner like or related to the unfair labor practices committed by [petitioner]."

Let a decree issue enforcing the Board's supplementary decision and revised order dated April 3, 1980.

Hopper, J., concurred.

**BROWN (G. A.), P. J.,** Concurring and Dissenting.—I agree that the evidence is sufficient to support the Board's conclusions regarding the unfair labor practices.

I concur in the result reached by the principal opinion with regard to the remedies imposed by paragraphs 1 (cease and desist order), 2(a) (expanded access), 2(b) (supplying payroll lists), 2(c) (posting notices), 2(d) (mailing copies of notice), and 2(f) (notification of steps taken to comply) of the revised order, with the qualifications set forth below.

I concur with paragraph 2(e) of the remedial order insofar as it requires a reading of the notice on company time to employees who were employed during the period when the unfair labor practice occurred.

I dissent from that part of paragraph 2(e) which requires the employer to pay for the time of persons assembled for a meeting during which the notice is to be read who were not employees at the time the unfair labor practices occurred and insofar as that paragraph requires the employer to pay all employees for the time it takes for a question and answer period after the reading of the notice.

The qualifications to my concurrence are these: First, the principal opinion in approving the remedies ordered quotes at length the ·language and reasoning of the Board's decision in *M. Caratan, Inc.* (1980) 6 A.L.R.B. No. 14, which is relied upon in the Board's decision in the instant case. I do not agree with all of the reasons stated in the Board's decision nor in all of the language used by the Board and therefore agree only in the result in that regard. Secondly, the remedies assessed are for the most part predicated upon presumed employment conditions generally existing in agriculture. For example, the phraseology of the Board's decision quoted in the principal opinion says "mailing is *often* the only method available for reaching..." and, again, the decision speaks of "the high degree of illiteracy or semi-literacy among agricultural employees," and says, "Agricultural workers *generally* do not assemble at a common place...," and "they *often* travel by private car or by bus from pickup points,..." and "farm workers do not *customarily* eat lunch at a common gathering place." The principal opinion also observes, "It is *possible* that current employees who were not working at the time of the unfair labor practices nonetheless may be aware of the illegal acts of the employer." (Italics added.) If, however, it is shown by the evidence in a particular case that these conditions do not exist, then the remedy should not be imposed in a routine and automatic way.

For example, the reading requirement is grounded upon illiteracy of the work force and the presumed problems of assembling employees other than while working. (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 355 [156 Cal. Rptr. 1, 595 P.2d 579]; see *Marine Welding and Repair Works, Inc.* v. *N. L. R. B.* (8th Cir. 1971) 439 F.2d 395, 399.) If, however, the proof in a particular case should show that illiteracy is not significant among the employees there involved and because of the size of the work force,

the living arrangements, or other factors it would be feasible to assemble the employees outside of work hours into a group or sizable groups, I am of the opinion that the reading requirement would not be justified.

In the case at bench, however, though petitioner has made arguments that the appropriate conditions do not exist in this case, it offered no proof of conditions different from those described by the Board either at the original hearing or upon remand to substantiate the claims it makes. Accordingly, the Board was justified in relying upon its so-called expertise and background knowledge of what the agricultural conditions generally are in formulating the order.

Attention is next drawn to that part of paragraph 2(e) which requires the petitioner to pay for the time of all persons currently employed, including those not employed when the unfair labor practices occurred, who attend the reading of the notice and an open-ended educational session held after the reading of the notice. It is to be noted that the session is not limited in time or to issues raised by the notice.

The fundamental consideration here is whether the Board can justify an order requiring the employer to pay for the education of agricultural laborers who have not been offended by the unfair labor practice[1] on the general theory that such an order "serves the important function of informing workers of the outcome of the unfair labor practice proceedings...," thereby effectuating the purposes of the act, including the encouragement and protection of agricultural employees to be free from interference, restraint or coercion in the exercise of their organizational rights. (Lab. Code, §§ 1160.3, 1140.2.)

As justification for the reading requirement to all employees, the Board expressly relies upon its decision in *M. Caratan, Inc., supra*, 6 A.L.R.B. No. 14, where it is stated: "Requiring employees to use their nonwork time to receive information about the results of an unfair labor practice proceeding and about their related statutory rights places an unwarranted burden on the employees. This is particularly true since the employer's illegal conduct, which this information is intended to remedy, arose in the context of the employment relationship. The reading, like other remedial provisions of the Order, serves to remove, insofar as possible, the consequences of Respondent's violations of the

---

[1]In this regard it is of more than passing interest to note that the mailing requirement (par. 2(d)) is limited to the persons who were on the payroll at the time of the unfair labor practice.

Act. Therefore, it is appropriate that Respondent bear the incidental costs of the remedy as part of its obligation to restore the status quo." (*Id.*, at p. 4.)

Also, the *Caratan* opinion in referring to the reading requirement to persons who were not employees at the time of the infraction states: "After due consideration of this portion of the Order, we find that the reading of the Notice to all agricultural employees of the Respondent employed at the time of the reading is an appropriate remedy. It is probable that, due to employee turnover, a certain percentage of workers employed by an agricultural employer at the time of a reading were not employed when the unfair labor practices took place. However, the fact that these workers were not employed at that time does not mean that they have no knowledge of the employer's misconduct. Agricultural employees generally speak to each other about their employment conditions and incidents which occur at their ranches and neighboring ranches. There is little doubt that workers will learn of an employer's illegal actions, particularly at their own place of employment, through informal communication with the other employees. Because the current workers who were not employed at the time of the misconduct are often aware of the employer's unfair labor practices, we believe it is necessary to have them present at the reading so as to dispel, as fully as possible, the effects of the respondent's misconduct." (*Id.*, at pp. 5-6.)

As to employees who were not there when the illegal practice occurred, however, the infractions did not arise in the context of the employment relationship, there are no consequences insofar as they are concerned to remove as a result of respondent's violation of the act, and there is no status quo to restore.

Thus it is apparent that the requirement that the employer pay substantial sums for the work time of persons who merely are aware of past misconduct but were not offended by the unlawful labor practices can only be justified under the vague and generalized theory that it "dispel[s], as fully as possible, the effects of the respondent's misconduct" and helps prevent future violations. The preventative aspect can only be interpreted as the imposition of this payment for past violations as a penalty to prevent future violations and evidences a punitive attitude. Prevention is one of the primary purposes of penalties both in civil and criminal law. It is plain therefore that the payment to these persons can be justified only by the value of educating laborers generally regarding their rights under the act.

It is obvious that if, for example, an order specifically required an employer to pay for a yearly educational course covering employees' rights under the act for all agricultural employees whether employed by the particular employer or not, this likewise would serve the purpose of the act by apprising employees of their organizational rights. However, it is inconceivable that such an order would be held other than an abuse of discretion and punitive. Yet on principle the analogy is indistinguishable from the case at bench.

I can find nothing in the act or prior authority, federal or state, that authorizes the board to require an employer who has been found to have engaged in an unfair labor practice to educate his employees as to their rights under the act, let alone to educate the general labor population, all at a substantial expense to the employer. Accordingly, I dissent from this requirement.

The respondent Board has cited *NLRB* v. *Rutter-Rex Mfg. Co.* (1969) 396 U.S. 258 [24 L.Ed.2d 405; 90 S.Ct. 417] to support the requirement that employers may be required to pay the cost. However, that case involved a make-whole remedy by way of back pay for employees for the unlawful failure to reinstate employees as a result of a labor dispute involving those employees. It invoked the policy of the National Labor Relations Board to make whole the employees for losses suffered on account of violations of the act by the employer. That case has no relation to the case at bench and lends no support to the Board's order.

Also, to support the imposition of the reading requirement at the expense of the employer, the Board cites *Marine Welding and Repair Works, Inc.* v. *N.L.R.B., supra,* 439 F.2d 395, 399; *N. L. R. B.* v. *Texas Electric Cooperatives, Inc., Treating Div.* (5th Cir. 1968) 398 F.2d 722, 726; and *N. L. R. B.* v. *Bush Hog, Inc.* (5th Cir. 1968) 405 F.2d 755. In each of those cases the court supported a reading requirement by evidence that a significant number of employees were unable to read a posted notice. Nothing in those cases supports the notion that the employer was required to pay for the work time during which the meeting was held nor that the reading was made applicable to any employees who were not members of the work force at the time the unfair labor practice occurred. The cases therefore lend no support for the proposition for which they are cited.[2]

---

[2] I am not unmindful of *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd., supra,* 24 Cal.3d 335, upon which respondent relies. In the dispository

The observations are pertinent to the requirement that the employer pay for an educational seminar after the reading of the notice. I note also that in this particular instance the subject matter of the seminar is not limited to the contents of the notice nor is there any limitation on the duration of the meeting. In this regard, I do not agree with the principal opinion in its observation in response to Jasmine's argument that the reading requirement is economically burdensome, unfair and punitive in nature, "that the actual reading of the notice will take but a few minutes and we should presume that the board representatives will be impartial in their explanation of employee rights and will not utilize any more company time than is reasonably necessary to answer employee questions."

The process of assembling all of the employees from widespread locations, reading the notice in several languages and then explaining the notice and answering questions in several languages and then transporting them back to the locations of their work would take more than a few minutes. I must also disagree with the position that this court should presume the Board and its representatives will be impartial and utilize a minimum of time.

More fundamentally, the Board can be faulted for asserting little efforts to fit the nature and magnitude of the remedy to the nature and magnitude of the offense. Unlike the NLRB which fashions the remedy in each particular case to fit the seriousness of the unfair labor practice and type of infraction, the ALRB typically imposes its boilerplate remedies irrespective of the seriousness of the unfair labor practice, the number of persons involved in the activity vis-à-vis the total number of work force, and the effect the practice may have had upon organizational activity. Accordingly, the employer wins a Pyrrhic victory when he prevails upon some but not all unfair labor charges that may be leveled against him as the Board routinely imposes the same onerous remedies upon the employer whether he is guilty of one minor or a doz-

---

sentences of that case the court stated, at page 355: "On the recommendation of the ALRB its order is modified in these respects: ... [¶] 3. References in paragraph 2(a), on reinstatement, and paragraph 2(e), on the reading of the notice, to the '1977' season are changed to the '1979' season."

The prior language of paragraph 2(e) is not set forth in the opinion, nor was the issue as to the reading of the notice on company time to nonemployees at the time of the unfair labor practice nor the issue of the educational session discussed by the court. From all that appears no issue of this change was raised or discussed by the parties except for what appears to have been an unopposed casual change in the dates.

Under these circumstances, I do not consider this authority as a binding precedent.

en major unfair practices. This is contrary to the spirit and principle of *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 30-35 [160 Cal.Rptr. 710, 603 P.2d 1306], standing for the proposition that the imposition of remedies should not be automatic.