[Civ. No. 4472. Fifth Dist. Jan. 15, 1981.]

M. B. ZANINOVICH, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

**COUNSEL**

Thomas, Snell, Jamison, Russell, Williamson & Asperger, Jay V. Jory, Howard A. Sagaser and John E. Peterson for Petitioner.

Ellen Lake, Manuel M. Medeiros, M. Jeffrey Fine, Elise Manders, Nancy C. Smith and Daniel G. Stone for Respondent.

Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen C. Flores, Jerome Cohen, William H. Carder, Ellen Greenstone, Tom Dalzell, Dianna Lyons and Sanford N. Nathan for Real Party in Interest.

OPINION

FRANSON, J.—

### STATEMENT OF THE CASE

On August 25, 1976, real party in interest United Farm Workers (UFW) filed an unfair labor practice charge against petitioner. Thereafter, a complaint was issued by the board's regional director alleging that on or about August 11, 1976, petitioner "established, implemented and otherwise enforced a discriminatory hiring policy which was designed to and did in fact result in the refusal to...rehire workers because of their participation in settlement proceedings with the board and their support of and activities on behalf of the UFW." Such activity was alleged to be in violation of Labor Code section 1153, subdivisions (a) and (c).[1] (All sections hereinafter referred to are Labor Code sections unless otherwise indicated.)

A hearing was held on the charge from August 8 through August 23, 1977.

On January 16, 1978, the administrative law officer (ALO) issued his decision and recommendation to the board. The ALO found that petitioner had committed an unfair labor practice with respect to three employees in violation of section 1153, subdivision (a), and recommended reinstatement of the employees with back pay. The ALO found that

---

[1]Labor Code section 1153 provides in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in section 1152.

"  .    .    .    .    .    .    .    .    .    .    .    .

"(c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization."

These code sections are identical to National Labor Relations Act (NLRA) section 8(a)(1) and (3). The Agricultural Labor Relations Act (ALRA) provides that the board must follow applicable precedents of the NLRA (§ 1148).

because the three workers had not been advised of the offers of reinstatement pursuant to the settlement agreement, a reasonable period of time for seeking reinstatement had not expired at the time they presented themselves to petitioner for reemployment in August 1976. The petitioner's refusal to rehire the group had a coercive effect on the employees in the exercise of their rights as guaranteed by section 1152.[2]

As to the alleged section 1153, subdivision (c) violation (discrimination in hiring to discourage union membership), the ALO concluded that the general counsel had failed to prove the antiunion animus required for such a violation. The ALO's reasoning on this point was that under the facts petitioner could have believed in good faith that the three employees did not want reinstatement under the settlement agreement since they did not apply for reinstatement until seven months after receiving their back paychecks. The hearing officer concluded: "[Petitioners'] actions are not so actively and inherently destructive of employees' union rights as to preclude the need for showing anti-union animus under *N.L.R.B.* v. *Great Dane Trailers, Inc.*, 388 U.S. 26."

On October 11, 1978, the board issued its decision. It upheld the ALO's finding that petitioner had unlawfully refused to hire the three employees in violation of section 1153, subdivision (a). However, in so holding, the board took a different path from the ALO by finding that "...irrespective of whether the...settlement agreement [was] still in effect when the three employees presented themselves for reemployment, [petitioner] violated Section 1153(a)...by assigning them 'negative seniority', in effect penalizing these employees for their participation in Board processes. Regardless of the motivation..., in the circumstances..., assigning negative seniority to these workers constitutes conduct which is 'inherently destructive of important employee rights' protected by the Act, and therefore violates Section 1153(a)," also citing *NLRB* v. *Great Dane Trailers* (1967) 388 U.S. 26 [18 L.Ed.2d 1027, 87 S.Ct. 1792].

The board made no finding as to the alleged section 1153, subdivision (c) violation because "such [finding] would not affect our remedial Order in this case."

---

[2] Section 1152 in pertinent part provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,..."

The board ordered petitioner to cease and desist from refusing to rehire former employees because of their efforts to redress union grievances through board processes or in any manner interfering with its employees in the exercise of their rights under section 1152. The board then ordered petitioner to take the following affirmative action: (1) offer the group immediate reinstatement to their former jobs without prejudice to their seniority right, said offer to remain in effect until the end of the 1979 harvest season; (2) reimburse the group for any loss of earnings and other economic losses they may have suffered as a result of petitioner's refusal to rehire them in August 1976, from the date of such refusal to rehire to the date on which they are offered reinstatement together with interest thereon at the rate of 7 percent per annum; (3) within 30 days from receipt of the order, to mail a copy of the attached notice in appropriate languages to each of the employees on its payroll during the 1976 harvest season; (4) post copies of the notice in conspicuous places on its property for a 90-day period to be determined by the regional director; and (5) arrange for a board representative to distribute and read the notice in appropriate languages to the assembled employees on company time. The reading or readings shall be at such times and places as are specified by the regional director. Following the reading, the board agent shall be given the opportunity, outside the presence of supervisors and management, to answer any questions employees may have concerning the notice or the employees' rights under the act.

On November 9, 1978, a petition for writ of review was filed with this court.

On February 29, 1980, without deciding the substantive issues presented by the petition for review, this court remanded the case to the board with directions to redetermine, among other things, whether paragraph 2(e) of the ordered remedies requiring a mailing of notice to the employees on petitioner's payroll during the 1976 harvest season was overbroad insofar as it emcompassed employees who were not aware of or otherwise suffered any harmful effects from the unfair labor practice and to reconsider paragraph 2(g) of the order requiring a board agent to distribute and read a prescribed notice to assembled employees on company time and to answer employee questions concerning the notice and employee rights under the act. The board was directed to take whatever additional evidence it deemed appropriate on the questions and to make new findings and a proposed order and to file same with this court within 60 days from the date of remand.

A certified record of the remand proceedings was filed with this court on May 16, 1980, which contained a supplemental decision and revised order. Insofar as pertinent to this review, the only changes made by the board from the original order were that it restricted the mailing of the notice to those employees who worked for petitioner during August 1976, rather than the entire 1976 harvest season, and it deleted the time limitation the offer of reinstatement is to remain open. The board took no additional evidence on the remand questions.

### STATEMENT OF FACTS

Petitioner is an agricultural employer engaged in producing table grapes.

Petitioner's need for farmworkers varies through the year. During December and January, little work goes on as the harvesting has ended. Thereafter pruning, cutting wild shoulders and leaf pulling is done. In May and June, preharvesting activities such as girdling, tipping and thinning the grapes takes place. From July to November, harvesting is performed.

Peak hiring occurs during the harvest season when petitioner employs 600 to 700 people.

The three employees whom petitioner wrongfully refused to rehire on August 11, 1976, were Mohamed Aldafari, Abdo M. Aldafari and Abdo A. Mosleh (the group). The group had worked for petitioner for several prior years in preharvest and harvest work.

Early in 1975, petitioner had established a seniority system after a review of his records had indicated it was facing a large turnover of employees and with increasing wages, efforts should be made to have the same employees return.

Petitioner's stated reason for the seniority system was to maintain an experienced work force and to minimize training requirements by getting the same people back year after year. The seniority system provides for seniority by crews with petitioner having seven to eight crews. The system provides for an employee to lose seniority, i.e., assigned a "negative" seniority if an employee quits, or is fired or *if the employee is contacted to return to work and fails to report*. In the event an employ-

ee who loses seniority because of the foregoing reasons thereafter seeks to return to work, the employee is referred to Phil Maxwell who makes the final decision whether the employee should be rehired. However, a person with "zero" seniority, i.e., someone who had not worked for petitioner before, would have preference over a former employee who had broken seniority by refusing to return to work.

Maxwell also testified the negative seniority system is normally not used during the pruning seasons in the winter and early spring because the weather is bad and lower wages are paid. Persons who refuse to work during pruning do not lose their seniority.

On October 31, 1975, petitioner entered into a stipulated settlement with the board's general counsel regarding certain unfair labor practice charges. The agreement provided petitioner would cease and desist from refusing to hire, rehire, fire or take any reprisal against any employee because he or she is a "Chavista" or a supporter of any union. Petitioner specifically agreed to offer to rehire Abdo M. Aldafari, Mohamed Aldafari, and Abdo Mosleh to their former jobs (these employees along with others had quit their jobs because of asserted harassment by petitioner's supervisor for supporting the UFW in a forthcoming election). It was provided the agreement did not constitute an admission by petitioner that the ALRA had been violated.

It was further agreed the board, through its general counsel, would be responsible for contacting the three employees to give them their back paychecks, to determine if they desired reinstatement and to communicate to them the procedure for reinstatement. The general counsel would then notify petitioner of those who had accepted reinstatement.

The employees who desired reinstatement would return to work immediately with petitioner and be put to work in the hand labor crew which was completing harvesting and would thereafter be involved in pruning.

Petitioner's attorney on November 14, 1975, wrote the board's Fresno regional director a letter which set forth petitioner's understanding all of the employees had been contacted and they had rejected the offer of reinstatement.

A similar letter was sent on December 29, 1975.

The regional director sent petitioner a letter dated January 6, 1976, advising petitioner it could not be assumed that all the employees did not wish reinstatement because the board had not yet been able to contact all of the employees and give them their back paychecks. (The board was having internal problems caused by a lack of funding; it was forced to close down its operations from early 1976 to the end of the year.)

In late January and early February 1976, the board delivered settlement checks to the employees representing their back pay. Although each employee stated at the time of receiving the check he would like to return to work at petitioner's ranch, none of them were advised by the board agents of the right to return to work or of the procedure for seeking reinstatement.

In mid-August 1976, after the harvest season had started, the group sought reemployment with petitioner. They went to the office of Phil Maxwell who was responsible for implementing the seniority system. Maxwell told them to return in two days. When they returned, Maxwell asked which of them had received the back paychecks. When the three employees were identified, Maxwell told them they could not return to work because they "took money, checks from the company."

Maxwell testified that after consulting his attorney, he decided to treat the three employees like other employees who had not accepted a recall for employment. He assumed since the group had received their checks, they must have also received the offers of reinstatement. By not accepting the offer of employment within a reasonable time, Maxwell reasoned that the employees had declined reemployment; hence, petitioner was under no obligation to hire the group because they had "negative" seniority.

Maxwell made no inquiry of the group at the time they sought reemployment as to whether they had been advised of their right to reemployment at the time they received their back paychecks in February 1976. Mohamed Aldafari testified he advised Maxwell that he (Aldafari) "didn't know that [he] was supposed to go back. Secondly, I said I don't work in pruning."

During the week ending August 10, six new workers without any seniority were hired into an Arab crew, and during the following week

another six new workers were hired into Arab crews. Despite petitioner's demonstrated need for workers, the three experienced employees who had taken part in the settlement agreement were not rehired.

### SUBSTANTIAL EVIDENCE ON THE RECORD AS A WHOLE SUPPORTS THE BOARD'S DETERMINATION THAT PETITIONER VIOLATED SECTION 1153, SUBDIVISION (a) WHEN IT REFUSED TO REHIRE THE THREE EMPLOYEES

The board's findings of fact are conclusive if supported by substantial evidence on the record considered as a whole (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 345 [156 Cal.Rptr. 1, 595 P.2d 579]). The substantial evidence standard is applicable even where the board makes findings which are inconsistent with those of the ALO (*Loomis Courier Serv., Inc.* v. *N.L.R.B.* (9th Cir. 1979) 595 F.2d 491, 495). Nevertheless, a reviewing court should scrutinize more critically those findings of the board which are inconsistent with those of the ALO and take into account whatever in the record fairly detracts from the board's findings. (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467, 71 S.Ct. 456].) This qualification exists because the ALO's credibility resolutions are to be given "special weight." (*Loomis Courier Serv., Inc.* v. *N.L.R.B., supra*, at p. 496.)

The ALO made two findings which are relevant to the board's decision. First, with respect to the alleged violation of Labor Code section 1153, subdivision (c) (discrimination in hiring), the ALO found that "[petitioner's] actions are not so actively and inherently destructive of employees' union rights as to preclude the need for showing antiunion animus under *NLRB* v. *Great Dane Trailers, Inc.*, 388 U.S. 26." Arguably, the ALO's conclusion as to the section 1153, subdivision (c) violation conflicts with the board's finding that petitioner's actions were inherently destructive of employee rights in violation of section 1153, subdivision (a). However, as we shall explain, an independent violation of section 1153, subdivision (a) does not require proof of illegal employer motive. The test is whether the employer's conduct reasonably tends to interfere with the free exercise of employee rights under the act.[3]

---

[3]In *Labor Board* v. *Burnup & Sims* (1964) 379 U.S. 21 [13 L.Ed.2d 1, 85 S.Ct. 171], the Supreme Court upheld the board's finding an employer's good faith discharge of employees engaging in a protected activity was a violation of NLRA section 8(a)(1) which is analogous to section 1153, subdivision (a). (But see *Textile Workers* v. *Darlington Co.* (1965) 380 U.S. 263 [13 L.Ed.2d 827, 85 S.Ct. 994].) Other cases have found employer motive important in *derivative* violations of NLRA section

Moreover, even if employer motive is deemed to be relevant on the issue of a section 1153, subdivision (a) violation, the board is perfectly free to disagree with the ALO by drawing an inference of improper motive based on its finding that the employer's conduct was inherently destructive of employee rights guaranteed by the act. (*NLRB* v. *Great Dane Trailers, supra*, 388 U.S. 26, 29 [18 L.Ed.2d 1027, 1031-1032].)

Second, with regard to the alleged violation of Labor Code section 1153, subdivision (a), the ALO concluded as follows: "The end result is that, with the exception of failing to report until well into the harvest season, the workers did in fact seek to regain their previous employment. That they did not act expeditiously is immaterial given that they had no knowledge of any such obligation. The problem thus boils down to a conclusion that, whatever the motive or ignorance of the employer, its conduct in failing to rehire the three undoubtedly had 'an inherently intimidating impact on workers' and was 'incompatible with the basic processes of the Act.'"

The board reached the same conclusion in upholding the section 1153, subdivision (a) violation but by a different rationale. It said: "In our view, irrespective of whether the terms of the settlement agreement were still in effect when the three employees presented themselves for reemployment, [petitioner] violated Section 1153 (a) of the Act by assigning them 'negative seniority', in effect penalizing these employees for their participation in Board processes. Regardless of the motivation for this application of [petitioner's] personnel rules, we conclude that, in the circumstances of this case, assigning negative seniority to these workers constitutes conduct which is 'inherently destructive of important employee rights' protected by the Act, and therefore violates Section 1153 (a). *NLRB* v. *Great Dane Trailers, Inc.*, 388 U.S. 26, 65 LRRM 2465 (1967)." (*M. B. Zaninovich, Inc.* (1978) 4 A.L.R.B. No. 70, p. 4.)

Petitioner contends the board failed to balance the business justification for its conduct in refusing to hire the group (negative seniority under its hiring system) as against the invasion of employee rights under section 1153, subdivision (a) as required by *NLRB* v. *Great Dane Trailers, supra*. It also argues the board failed to make adequate findings as to how it applied the balancing test articulated in *Great Dane, supra*. Neither contention has merit.

8(a)(1)—that is where the conduct was also a violation of NLRA section 8(a)(3) as discrimination in term or condition of employment. (See Morris, The Developing Labor Law (1971) pp. 66-68.) Since petitioner was not found by the board to have violated section 1153, subdivision (c), these cases are inapplicable.

In *NLRB* v. *Great Dane Trailers, supra*, the Supreme Court held that although there was no proof of antiunion bias, the employer's act of refusing to pay accrued vacation benefits to striking employees under a terminated collective bargaining agreement while promising to pay such benefits to nonstrikers and strike replacements was inherently destructive of important employee rights under NLRA section 8(a)(3) and constituted an unfair labor practice. The court announced certain rules for finding an unfair labor practice based on discrimination in term or condition of employment: a finding of unfair labor practice normally turns on whether discriminatory conduct was motivated by an antiunion purpose. Proof of such employer motivation may make unlawful employer conduct which in other circumstances would have been perfectly lawful.

Nevertheless, if the employer's discriminatory conduct is "inherently destructive of employee rights,"[4] no proof of antiunion motivation is needed and the board can find an unfair labor practice even if the employer introduces evidence that its conduct was motivated by business considerations.

After stating these general rules, the court discussed the burden of proof in discrimination cases: "If the conduct in question falls within this 'inherently destructive' category, the employer has the burden of explaining away, justifying or characterizing 'his actions as something different than they appear on their face,' and if he fails, 'an unfair labor practice charge is made out.' [*N.L.R.B.* v. *Erie Resistor Corporation, supra*, 373 U.S. at 228.] *And even if the employer does come forward with counter explanations for his conduct in this situation, the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.*" (*NLRB* v. *Great Dane Trailers, supra*, 388 U.S. at pp. 33-34 [18 L.Ed.2d at pp. 1034-1035]. Italics added.)

The emphasized portion of the above quotation is critical to the case at hand. Even though petitioner offered proof of its seniority system as

---

[4]The Supreme Court defined "inherently destructive" conduct as conduct which carries with it "'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.'" (*NLRB* v. *Great Dane Trailers, supra*, 388 U.S. 26, 34 [18 L.Ed. 2d 1027, 1035]; *Labor Board* v. *Erie Resistor Corp.* (1963) 373 U.S. 221, 228-231 [10 L.Ed.2d 308, 314-316, 83 S.Ct. 1139, 94 A.L.R.2d 1147].)

an explanation for its refusal to rehire the group, the board nonetheless could draw an inference of improper employer motive and strike the balance between the business justification and the invasion of employee rights in favor of the group. This in essence is precisely what the board did when it found that petitioner had violated section 1153, subdivision (a) "by assigning [the group] 'negative seniority,' in effect penalizing these employees for their participation in Board processes."

The evidence that Maxwell told the group they could not return to work because they "took money, checks from the company" together with the evidence (reasonable inference from Mohamed Aldafari's testimony) that Maxwell was told at the time the group sought reemployment that they did not know of the prior offer of reinstatement supports the board's finding that petitioner assigned a negative seniority to the group to penalize them for participating in board procedures.

Furthermore, because the group was never advised of the offer of reinstatement pursuant to the settlement agreement, petitioner's seniority plan itself did not authorize the refusal to rehire. Under the plan, it is only when a former employee refuses to return to work after being contacted to do so, that he can be given negative seniority to the end that new workers with zero seniority can be hired ahead of the former worker. Thus, petitioner's argument that Maxwell was entitled to treat the settlement agreement as the equivalent of a written recall in the face of Aldafari's statement that he didn't know that he was supposed to return to work is quite disingenuous.

Petitioner argues that its conduct caused no interference with the rights of the group because they were not seeking employment pursuant to the terms of the settlement agreement since a reasonable time for seeking reemployment had long since expired. The fallacy in this argument is it assumes the only employee rights which petitioner could interfere with were those arising under the settlement agreement. The board, however, found an unfair labor practice "irrespective of whether the terms of the settlement agreement were still in effect when the three employees presented themselves for reemployment...." (4 A.L.R.B. No. 70, p. 4.)

Under the board's theory, whether the terms of the settlement agreement were violated is of no moment to the question whether the petitioner violated section 1153, subdivision (a). To establish that the

board erred, petitioner must show there was no substantial interference with *any* employee rights guaranteed by section 1152.

The group's prior involvement with the board's settlement procedures must be deemed a protected employee activity within the act (cf. *Better Monkey Grip Company* (1956) 115 N.L.R.B. 1170, enforced (5th Cir. 1957) 243 F.2d 836, cert. den. 355 U.S. 864 [2 L.Ed.2d 69, 78 S.Ct. 96]; see also *N.L.R.B.* v. *Southland Paint Company* (5th Cir. 1968) 394 F.2d 717; *Vogue Lingerie, Inc.* v. *N.L.R.B.* (3d Cir. 1960) 280 F.2d 224).

As we have mentioned, an independent violation of section 1153, subdivision (a) normally does not require proof of employer motive; the essential elements of the statute, like its counterpart (§ 8(a)(1)), is employer conduct which interferes with, restrains or coerces an employee in the exercise of his rights under the act (see *Labor Board* v. *Burnup & Sims, supra,* 379 U.S. 21; Gorman, Basic Text on Labor Law (1976) pp. 132-134). Hence, it was unnecessary for the board in the present case to find an antiunion animus on the part of petitioner.[5]

In *Textile Workers* v. *Darlington Co., supra,* 380 U.S. 263, 268 [13 L.Ed.2d 827, 833, 85 S.Ct. 994], the Supreme Court expressed a caveat: "[C]ertain business decisions will, to some degree, interfere with concerted activities by employees. But it is only when the interference with § 7 rights [comparable to section 1152] outweighs the business justification for the employer's action that § 8(a)(1) is violated." (380 U.S. at p. 268 [13 L.Ed.2d at p. 833].)

The board's finding that assigning negative seniority to the group *"in the circumstances of this case"* was inherently destructive of employee rights is a judgment call based on the board's expertise in labor-management relations. The finding is grounded on a policy determination that the effect of the conduct on employee rights was greater than the

---

[5] It also is generally agreed to establish a NLRA section 8(a)(1) violation, "it is not necessary to demonstrate... that particular employees were actually coerced; it is sufficient if the General Counsel can show that the employer's actions would tend to coerce a reasonable employee." Furthermore, "[i]t is not necessary to demonstrate that the employer *intended* to produce that effect." (Gorman, Basic Text on Labor Law, *supra,* pp. 132-133, citing *Republic Aviation Corp.* v. *Board* (1945) 324 U.S. 793 [89 L.Ed.1372 65 S.Ct. 982, 157 A.L.R. 1081].) An important qualification `~ ʼhis rule, not applicable to this case, is whether the employer conduct advances a substantial and legitimate company interest in plant safety, efficiency or discipline. (Gorman, *supra.*) The record supports the board's implied finding that the application of petitioner's seniority system to the three employees in this case did not advance such an interest.

importance to the employer of his seniority system. We cannot overturn the board's exercise of its discretion in this instance. (See Gorman, Basic Text on Labor Law, *supra*, pp. 133-134.)

Petitioner's citation to federal cases which uphold refusal by employers to reemploy workers who did not timely accept offers of reinstatement is inapposite in that most of the cases involved offers of reinstatement which were actually delivered to the workers.

*N.L.R.B.* v. *Pepsi Cola Company of Lumberton, Inc.* (4th Cir. 1974) 496 F.2d 226 which involved an offer of reinstatement which was not communicated to the worker, is distinguishable because there was no duty to make the offer in the first place. The fact the worker never knew of the offer was irrelevant. In the present case, a duty was imposed on petitioner by its own seniority rules to communicate the reinstatement offer to the group members before they could be assigned negative seniority.

Petitioner's argument that its good faith belief that the notices of reinstatement had been delivered to the group because they had received and cashed back paychecks in early 1976 excuses its failure to deliver the recall notice under its seniority system, citing *N.L.R.B.* v. *Pepsi Cola Company of Lumberton, Inc., supra*, 496 F.2d 226, 229 and *Knickerbocker Plastic Co.* (1961) 132 N.L.R.B. No. 1209, is again wanting.

In *N.L.R.B.* v. *Pepsi Cola Company of Lumberton, Inc., supra*, an employer reached an agreement with the union whereby the employer would reinstate striking workers. One worker, William Jones, was never contacted regarding the offer of reinstatement. The court held the employer's refusal to reinstate Jones after a reasonable time had expired did not constitute an unfair labor practice. However, the case is distinguishable because the employer was not obligated to contact Jones under the agreement. In the present case, petitioner could not refuse to rehire the group under its seniority system unless they had been notified by petitioner that they were being recalled for employment. Therefore, *N.L.R.B.* v. *Pepsi Cola Company of Lumberton, Inc., supra*, was not decided on the ground that a good faith effort to communicate an offer of reinstatement constitutes a fulfillment of an employer's duty to deliver a notice of recall.

In *Knickerbocker Plastic Co., supra*, 132 N.L.R.B. No. 1209, an employer sent letters to its workers pursuant to an order from the NLRB offering them reinstatement if they applied within one week. Some of the workers did not receive the letter. The board determined the workers were entitled to back pay from the time of their discharge until their reinstatement. However, with respect to those workers who had not received the offers, the board held that the mailing in good faith of the offer tolled the period for computing back pay. The board stated: "As a general proposition, if an employer in good faith mails an offer of reinstatement to an employee who has been discriminatorily discharged, addressed to the employee's last-known address, the Board tolls backpay from the date of the attempt to deliver such notice." (*Knickerbocker Plastic Co., supra*, at p. 1236.)

*Knickerbocker Plastic* is distinguishable. While petitioner's reliance upon the board to communicate its offer of reinstatement to the employees would be analogous to a good faith mailing, petitioner was put on notice that the efforts of the board might not be successful. In the last communication to petitioner by the board, petitioner was cautioned against assuming that the offers of reinstatement would be delivered to the group.[6] The board agent also indicated that if and when the board delivered the offers of reinstatement to the workers, the board would contact petitioner and inform him of the employees' decision. Absent such a follow up communication, the board could reasonably conclude that petitioner was not justified in believing the offers of reinstatement had been communicated to the employees.

Another principal supports the board's determination that petitioner's refusal to rehire the group constituted an unfair labor practice. In *Labor Board* v. *Burnup & Sims, supra*, 379 U.S. 21, an employer in good faith discharged two employees whom it believed had made violent threats against the company when the employees tried to solicit union memberships. The NLRB held the employer's honest belief that

---

[6]In a letter dated January 6, 1976, and received by petitioner's attorneys on January 7, Frederick Lopez, the board agent for the ALRB, stated the following: "With regard to your letter of January, 1976, in which you indicate what steps you've taken to comply with the formal settlement agreement in the above-referenced matter, you note you have drawn an assumption that the employees therein named do not wish reinstatement with the employer. Based on the facts known to us, it seems that said assumption cannot be made at this time. As of yet, this agency has not been able to contact all those employees therein named and is currently attempting to contact said employees so as to give them the backpay checks which you have supplied this agency with.

"After we have contacted said employees you will be notified as to what they indicated with regard to reinstatement with the company."

good cause existed to discharge the employees did not constitute a defense. The court of appeal reaches a different result. The United States Supreme Court reinstated the NLRB decision and held section 8 (a)(1) of the NLRA is violated "if an employee is discharged for misconduct arising out of protective activity, despite the employer's good faith, when it is shown the misconduct never occurred." (379 U.S. at p. 23 [13 L.Ed.2d at p. 3].) The Supreme Court justified its holding as follows: "That rule seems to us to be in conformity with the policy behind § 8(a)(1). Otherwise the protected activity would lose some of its immunity, since the example of employees who are discharged on false charges would or might have a deterrent effect on other employees. Union activity often engenders strong emotions and gives rise to active rumors. A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith. It is the tendency of those discharges to weaken or destroy the § 8 (a)(1) right that is controlling. We are not in the realm of managerial prerogatives. Rather we are concerned with the manner of soliciting union membership over which the Board has been entrusted with powers of surveillance." (*Labor Board* v. *Burnup & Sims, Inc., supra*, at pp. 23-24 [13 L.Ed.2d at pp. 3-4].)

*Burnup & Sims* appears to govern in the instant case. The Supreme Court held a violation of section 8(a) was established merely by a showing "that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct." (*Id.*, at p. 23 [13 L.Ed.2d at p. 3].) In the present case, the employees were refused reemployment on the basis of an act which occurred during their attempt to effectuate their rights under an agreement reached between the petitioner and the board regarding an unfair labor practice charge. The petitioner must be presumed to have known this. The employees were innocent of any wrongdoing. The fact petitioner may have acted in good faith would not justify its conduct.

The finding of the board also is supported by *NLRB* v. *Rutter-Rex Mfg. Co.* (1969) 396 U.S. 258, 263-266 [24 L.Ed.2d 405, 410-412, 90 S.Ct. 417] where the NLRB ordered an employer to pay backpay to a worker for a delay which was attributable solely to the actions of the NLRB. The Supreme Court held the allocation of the burden created by the burden of the actions of the NLRB was within the discretion of

the board: "[T]he [N.L.R.B.] is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers....[¶] [T]he back-pay remedy is ...not only punishment for an unfair labor practice, but is also a remedy designed to restore, so far as possible, the status quo that would have obtained but for the wrongful act."

For all of the reasons stated, we conclude petitioner has failed to establish it had a sufficiently legitimate business interest in refusing to reinstate the employees to offset the coercive effect its actions had on the effectuation of employee rights. Therefore, the board's finding that petitioner's conduct was "inherently destructive of important employee rights protected by the Act" is supported by the evidence.

### The Doctrines of Estoppel and Entrapment Are Inapplicable to the Facts of This Case

Appellant contends it should not be held responsible for the failure to make actual delivery of the offers of reinstatement to the employees under the doctrines of estoppel or entrapment. The doctrine of entrapment is applicable to administrative proceedings. (*Patty* v. *Board of Medical Examiners* (1973) 9 Cal.3d 356 [107 Cal.Rptr. 473, 508 P.2d 1121, 61 A.L.R.3d 342].) The doctrine of estoppel is applicable against government agencies. (*La Societe Francaise* v. *Cal. Emp. Com.* (1943) 56 Cal.App.2d 534, 555 [133 P.2d 47].) Petitioner argues these doctrines become applicable to the board because it created the impression that it would deliver the reinstatement offers to the employees.

As discussed above, the last communication from the board consisted of a letter in which it informed petitioner that if and when the offers of reinstatement were delivered to the employees, the board would inform petitioner. The board never misrepresented to petitioner that the offers were delivered. Petitioner has failed to show how the elements of estoppel or entrapment can be applied to this case despite the failure of the board to make any misrepresentation the offers had been delivered. Nor does petitioner discuss the effect on the applicability of these doctrines of Maxwell's opportunity to determine the true facts when the employees applied for reinstatement.

■ ANY ERROR BY THE ALO IN REFUSING TO ADMIT EVI-
DENCE WHICH WOULD HAVE TENDED TO PROVE PETI-
TIONER HAD NO IMPROPER MOTIVE IN REFUSING TO
HIRE THE SETTLEMENT EMPLOYEES WAS HARMLESS

Petitioner contends the ALO erred when it refused to admit evidence "which would have tended to prove the Employer had no improper motive in refusing to hire the settlement employees." The evidence at issue consisted of the proposed testimony of other workers who would have stated petitioner did not discriminate against them even though they had been involved with settlement negotiations with the board. The apparent rationale for excluding this evidence was it was (1) irrelevant and (2) inadmissible as propensity evidence under Evidence Code section 1101.

Determinative of this issue is the fact that even if the ALO erred in refusing to admit the evidence, the error was harmless because it is unlikely that the board would have reached a different result even if the evidence had been admitted. As discussed above, the board's determination petitioner violated section 1153, subdivision (a), was based in part on the ground the harmful effect of petitioner's refusal to rehire the group outweighed the importance of the seniority system to the employer under the facts of this case. Such a policy determination is sustainable without any finding that petitioner's conduct was motivated by an antiunion animus.

■ THE MAILING, READING AND EDUCATIONAL
REMEDIES OF THE BOARD'S REVISED ORDER
ARE INAPPROPRIATE UNDER THE CIRCUM-
STANCES AND SHOULD NOT BE ENFORCED

Pursuant to our remand, on May 16, 1980, the board filed a supplemental decision and revised order wherein it ordered petitioner to mail a copy of the specified notice[7] to each of the employees on its payroll

---

[7] "NOTICE TO EMPLOYEES
"After a trial in which each side had a chance to present its side of the story, the Agricultural Labor Relations Board has found that we interfered with the rights of our employees to act together to try to get a contract or to help one another as a group. The Board told us to send out and post this Notice.
"We will do what the Board has ordered, and also tell you that the Agricultural Labor Relations Act is a law that gives all farm workers these rights:
"(1)   To organize themselves;
"(2)   To form, join, or help unions;

during the month of August 1976; to post copies of the notice in conspicuous places on its property for a 90-day period to be determined by the regional director; and to arrange for a board agent to distribute and read the notice in the appropriate languages to current employees on company time at such times and places as are specified by the regional director. (We understand the director's practice is to order the reading of the notice during peak employment at the ensuing harvest season.) Following the reading, the board agent is to be given the opportunity outside the presence of supervisors and management to answer any questions the employees may have concerning the notice or their rights under the act.

Petitioner objects to the mailing, reading and educational requirements of the revised order on the grounds they are not remedial but punitive in nature and are beyond the board's power to award affirmative relief as authorized by the Agricultural Labor Relations Act. We agree.

Labor Code section 1160.3 authorizes the board after it finds an unfair labor practice to have occurred, to issue a cease and desist order and to order the guilty party to take affirmative action "when the board deems such relief appropriate, ... and to provide such other relief as will effectuate the policies of [the act]."

The board contends the mailing of the notice to those employed when the unfair practice occurred and to current employees is within the scope of the affirmative relief authorized by the statute because it is essential to convey the remedial information to attenuate any adverse

---

"(3)  To bargain as a group and to choose whom they want to speak for them;

"(4)  To act together with other employees to try to get a contract or to help and protect one another; and

"(5)  To decide not to do any of these things.

"Because this is true, we promise that: [¶] We will not do anything in the future that forces you to do, or stops you from doing, any of the things listed above. [¶] Especially: [¶] WE WILL NOT do anything which penalizes you for getting help from the Agricultural Labor Relations Board in protecting your legal rights. [¶] WE WILL offer Mohamed M. Aldafari, Abdo M. Aldafari and Abdo Mosleh their old jobs back, and we will pay them any money they lost because we refused to rehire them in August 1976. Dated:

"M. B. ZANINOVICH, INC.
By:_____
(Representative)   (Title)

"This is an official Notice of the Agricultural Labor Relations Board, an agency of the State of California.

"DO NOT REMOVE OR MUTILATE"

impact the unfair practice may have had on the employees. The impact comes about presumably by inhibiting the employees in the future exercise of their rights under the act. Thus, employee knowledge that their rights are being protected by the board may encourage the future exercise of those rights. Because agricultural employee turnover is high, the mailing of notice only to current employees would not attenuate the impact as to the workers who were employed at the time of the event.

Petitioner's attenuation argument concerning the mailing remedy is grounded, however, on the premise that the employees working on the ranch in 1976 somehow acquired knowledge of the unfair labor practice, which is an unwarranted assumption in this case. The record is devoid of any evidence that any of the employees on petitioner's ranch other than Maxwell became aware of the unfair labor practice.[8]

The board's attempt to infer employee knowledge from its expertise based on its cumulative experience derived from other cases (see *Tex-Cal Land Management, Inc., supra,* 24 Cal.3d 335, 355; *Labor Board v. Seven-Up Co.* (1953) 344 U.S. 344, 348-349 [97 L.Ed.377, 382-383, 73 S.Ct. 287]) must fail. In *Tex-Cal, supra,* the Supreme Court held that the board could rely on its cumulative knowledge farmworkers have low literacy levels, which of course is a far cry from the question whether in a particular case employees have actually been intimidated by the employer's wrongful misconduct. Employee knowledge of specific unfair labor practices must be proved rather than conjectured upon in order to justify the imposition of a remedy to alleviate the injury.

In *Labor Board v. Seven-Up Co., supra,* the Supreme Court held that in devising a backpay order, the NLRB was not confined to the record of a particular proceeding but that it could adopt a formula based on economic data from other proceedings. Application of a standard economic formula to be used in like cases again is far different from infering employee impact solely from an isolated unfair labor practice act.

In sum, absent evidence of open, repetitive or egregious employer misconduct from which it reasonably may be inferred that other work-

---

[8]Mohamed Aldafari testified that he went alone to visit Maxwell on the day he, Abdo Aldafari and Abdo Mosleh were refused employment and that he did not talk to any of petitioner's other workers after the meeting with Maxwell. Absent contrary evidence, a reasonable inference arises that *none* of the other members of the group talked to other employees—the group apparently went elsewhere to look for employment.

ers acquired knowledge of the misconduct, it cannot be inferred the unfair labor practice had an impact on the other employees; such an impact must be proved to justify the imposition of a mailing remedy. (Cf. *M. Caratan, Inc.* (1980) 6 A.L.R.B. No. 14; *Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968 [170 Cal.Rptr. 510], involving broad patterns of employer misconduct.)[9]

The same analysis applies to the reading and education remedies.

The board refers to its decision in *M. Caratan, Inc., supra,* for a statement of its reasons for ordering a reading of the remedial notice to current employees followed by a question and answer period on paid company time and why such a procedure may not be accomplished simply by posting the notice at various places on the employer's property or reading the notice immediately before or after regular work hours or during the luncheon break at the sites where the individual crews are working. Reading the notice on company time is essential to ensure the widest possible dissemination of the order because of worker illiteracy and because, unlike the industrial setting, farmworkers do not assemble at a common place and time before or after the workday. They work in scattered groups over many acres of fields during the course of a given day. They eat their lunches in their cars or in the buses or in the fields where they happen to be working. Moreover, the wrongdoing employer should bear the incidental cost or the remedy as part of its obligation to restore the status quo.

In *Jasmine Vineyards, Inc., supra,* this court approved the board's reasoning in *Caratan, supra,* insofar as it applied to the particular facts in *Jasmine* and upheld the board's discretion to order the mailing, reading and educational remedy pursuant to section 1160.3.

However, unlike the violations in *Caratan* and *Jasmine* which involved repeated, purposeful acts of misconduct by the employer in the presence of other workers, the case at bench involves a single, isolated, somewhat "technical" act which occurred in the privacy of a supervisor's office and was, perhaps, unaccompanied by any union animosity or illegal motive toward the employees. Indeed, the ALO expressly found that under the facts petitioner could have believed in good faith that the group did not want reinstatement under the settlement agreement be-

---

[9]Even though we suggested in our remand order that the Board take additional evidence on the propriety of the ordered remedies, it elected not to do so.

cause they had not applied for reinstatement until seven months after receiving their checks. The board had no quarrel with this finding—it simply held it was irrelevant in that petitioner's conduct was inherently destructive of the group's rights under the act regardless of petitioner's motive.

Several cases illustrate the proper exercise of board discretion in ordering the mailing, reading and educational remedies tailored to the circumstances of the case. In *Jasmine, supra,* the employer was found to have denied access to UFW organizers while granting access to Teamster union members, threatening employees with loss of employment if they voted for the UFW, rendering assistance to the Teamsters by means of discriminatory enforcement of a nonsolicitation rule, and soliciting employees to sign cards for the Teamsters. In *M. Caratan, supra,* the employer was found to have purposely assigned employees to work which injured their hands and resulted in their constructive discharge. A supervisor openly sought to discourage employees from filing unfair labor practice charges which was found to be a calculated effort to discourage the use of board processes.

In *Vista Verde Farms* (1977) 3 A.L.R.B. No. 91, the employer was found to have engaged in pushing, shoving and challenging union organizers to fight in the presence of employees. In *Western Tomato Growers & Shippers, Inc., Stockton Tomato Company, Inc., and Ernest Perry* (1977) 3 A.L.R.B. No. 51, the employer brandished firearms to prevent union organizers from taking access to its field. All of these cases show facts which justify the mailing, reading and educational remedies to alleviate the adverse impact of the employer's misconduct on the employees.

The board argues that the remedial order is "preventative" in nature, yet there is no suggestion that petitioner again would be tempted to engage in such misconduct; it would be a contemptuous violation of the cease and desist order which we cannot assume will occur.

Under the NLRA, orders to remedy section 8(a)(1) violations (identical to Lab. Code, § 1153, subd. (a), violations) normally are limited to cease and desist orders with a 60-day notice and posting requirement that the employer will not in the future engage in the conduct found to be violative of the act (Morris, The Developing Labor Law (1971) p. 852). Blanket orders similar to the one before us may issue in section 8

(a)(1) cases if the unlawful interference, restraint or coercion violates other sections of the act or is part of a broad pattern of unlawful conduct.[10]

The automatic issuance of a particular affirmative remedy in every section 1153, subdivision (a), violation case contravenes the "spirit and principle" of *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603 P.2d 1306] (see *Jasmine Vineyards, Inc., supra,* conc. and dis. opn. of Brown, P. J.). In *Norton* it was held the automatic award of make-whole relief under section 1160.3 in a technical refusal to bargain case is an abuse of discretion. The court emphasized that the statutory language authorizing the board to order make-whole relief when it "'deems such relief appropriate'" requires the board to evaluate "the facts and equities of the particular case" to determine whether the employer acted in good faith in challenging the election certification (26 Cal.3d at p. 36). We believe this judicially declared statutory limitation on the board's authority should apply also to the language "such other relief as will effectuate the policies of [the act]" in section 1160.3, which necessarily includes the mailing, reading and educational remedies.

We fully respect the board's broad discretion to issue such affirmative orders as will effectuate the declared policy of the State of California to "encourage and protect" the rights of farmworkers to freedom of association and to organize and engage in collective bargaining and to be free from the interference, restraint and coercion of employers. (Lab. Code, § 1140.2; see *Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd. supra.*)

In the typical case, where the employer's illegal conduct is visible to others or is so flagrant in nature that it reasonably may be presumed that knowledge of the incident will spread among the other employees (both present and future), the board's remedies will be upheld by the reviewing court. What we say only is that in the context of the particular facts of this case such a remedy exceeds the board's statutory authority because it bears no rational, convincing relationship to the un-

---

[10]To the board's argument that the mailing and reading remedy in this case is "tailored to fit both the circumstances of the case and the realities of agricultural work patterns...," petitioner states that "a review of the remedies imposed by the ALRB in one hundred unfair labor practice cases beginning with...3 ALRB No. 29 (1977)...reveals..., in all but two of those one hundred cases, the remedy imposed" was the same as in this case. Neither the board nor the union challenge this statement, and we will assume it to be true.

fair labor practice. As a consequence, the remedy becomes punitive in nature because it imposes an undue economic burden on the employer. Petitioner estimates the cost of mailing the notice to the 600 workers employed in August 1976 and reading the notice to the same number of workers on company time during 1981 will be in excess of $2,000.

"'[I]t is as old in philosophy at least as Aristotle, and it is settled in the law as well, that the application of an apparently uniform rule may in reality engender unfair discrimination when like measures are applied to unlike cases.'" (*J. R. Norton, supra*, at p. 31 quoting from *International Union of E., R. & M. W., AFL-CIO* v. *N.L.R.B.* (D.C. Cir. 1970) 426 F.2d 1243, 1250.)

By analogy to the criminal law tenet that the punishment should fit the crime, in the adjudication of labor disputes the remedy should fit the unfair labor practice.

The board's all-inclusive cease and desist order whereby petitioner is prohibited from refusing to rehire former employees because of their efforts to redress union related grievances through board processes and from in any manner interfering with, restraining or coercing its employees in the exercise of their rights under the act, together with the affirmative order to offer the group reinstatement to their former jobs without prejudice to seniority or other rights and privileges and to reimburse the employees for any loss of earnings and other economic losses which they may have suffered as a result of petitioner's refusal to rehire them in August 1976, with interest at 7 percent per annum and the posting of the notice in all appropriate languages in conspicuous places on petitioner's property for a 90-day period, is a sufficiently plenteous remedy to alleviate the consequences of petitioner's unlawful conduct. Anything further would be a glaring overkill at best.

### THE OFFER OF REINSTATEMENT SHOULD REMAIN OPEN UNTIL THE END OF THE 1981 HARVEST SEASON

Petitioner misinterprets the purpose of eliminating the reference to the year 1979 in the revised order of the board. The original order was issued in 1978 and the board understandably fixed the time limit for the offer of reinstatement to the group must remain open to the end of the forthcoming 1979 crop year.

Reinstatement offers must be accepted within a reasonable period of time. (See *N.L.R.B.* v. *Betts Baking Company* (10th Cir. 1970) 428 F.2d 156.) The board's original order requiring petitioner to keep the offer open for one crop year appears to be reasonable.

It is ordered that paragraphs 2(e) and (g) of the supplemental decision and revised order dated May 9, 1980, be deleted. It is further ordered that paragraph 2(a) be amended to require the offer of reinstatement to Mohamed Aldafari, Abdo Aldafari and Abdo Mosleh remain open until the end of petitioner's 1981 harvest season. In all other respects the order as amended is affirmed.

Let a decree of enforcement issue.

Brown (G. A.), P. J., concurred.

**HOPPER, J.**—I concur with regard to the holding on the unfair labor practice and wish to state my position with respect to the remedies being stricken. I agree that those remedies are so disproportionate to the unfair labor practice under the peculiar circumstances of this case (there being no evidence *in the record* that any employees other than Maxwell became aware of the unfair labor practice) as to be an abuse of discretion. I reach this conclusion on remedies reluctantly because I personally believe the issue of appropriate remedies is best left to the administrative agency using its expertise developed over large numbers of cases, and I recognize that generally a court "must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy" (*Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845, 852, 133 A.L.R. 1217]). We also must keep in mind that the Agricultural Labor Relations Act (ALRA) allows broader remedial relief than does the National Labor Relations Act (compare § 10(c) of the National Labor Relations Act and the corresponding ALRA provision found in Lab. Code, § 1160.3).

In the absence of an abuse of discretion this court is required to give considerable weight to an administrative determination. Such determination should stand unless there is an abuse of discretion. I agree that there is a showing of abuse of discretion in this case. The mailing, reading and educational remedies ordered by the board *under these*

*particular facts* are oppressive and punitive in nature. Generally, education of, and information to, employees is well within the purposes of the ALRA. Employees are interested parties who are entitled to know the results of hearings on alleged unfair labor charges. Their experience may influence their future participation in the benefits of and the exercise of rights under the ALRA. In the vast majority of cases the mailing, reading and educational remedies will be appropriate upon the finding of an act of unfair labor practice. Not so under the particular circumstances present in this case. To swat a fly one uses a fly swatter or similar weapon, not a bazooka.

Finally, I offer a suggestion. Without wishing to appear pompous, presumptuous or officious, and at the risk of slipping into the spacious domain of policy which belongs to the board, and fully aware that there are even more onerous remedies available, I suggest that in the use of remedies for their possible deterrent effect, the board might well consider the question: If every unfair labor practice, no matter how picayune it might be, and no matter which party (employer or labor organization) commits it, warrants the remedies ordered stricken here, what does one do for an encore in the way of a remedy when the unfair labor practice is in fact egregious?

A petition for a rehearing was denied February 10, 1981, and petitioner's application for a hearing by the Supreme Court was denied March 11, 1981. Bird, C. J., did not participate therein.